No. 18-56292

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

**CITY OF LOS ANGELES,**
*Plaintiff-Appellee*,

**v.**

**JEFFERSON B. SESSIONS III, et al.,**
*Defendants-Appellants*.

On Appeal From The United States District Court
For The Central District Of California

## BRIEF OF PLAINTIFF-APPELLEE CITY OF LOS ANGELES

Mitchell A. Kamin
Mónica Ramírez Almadani
Neema T. Sahni
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, California 90067
(424) 332-4800

David M. Zionts
Ivano M. Ventresca
Benjamin L. Cavataro
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
(202) 662-6000

Michael N. Feuer
  *City Attorney*
James P. Clark
  *Chief Deputy City Attorney*
Leela A. Kapur
  *Executive Assistant City
  Attorney*
Valerie L. Flores
  *Managing Senior Assistant City
  Attorney*
Michael Dundas
  *Deputy City Attorney*
200 North Main Street, City Hall
East Suite 800
Los Angeles, California 90012
(213) 978-8344

*Attorneys for Plaintiff-Appellee City of Los Angeles*

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ................................................................................1

JURISDICTIONAL STATEMENT .......................................................3

ISSUES PRESENTED...........................................................................4

STATUTES AND REGULATIONS INVOLVED ...................................4

STATEMENT OF THE CASE................................................................5

    A.    Congress Established The Byrne JAG Program As A Formula Grant For Local Criminal Justice Funding............................................5

    B.    DOJ Has Imposed New Conditions On Byrne JAG Awards To Require State And Local Government Recipients To Participate In Federal Civil Immigration Enforcement...........................................8

    C.    Los Angeles's Past Use Of Byrne JAG Funding And Its 2017 Application For This Grant Promote Critical Local Law Enforcement Objectives ......................................................12

    D.    Procedural Background ......................................................14

SUMMARY OF ARGUMENT ..............................................................16

STANDARD OF REVIEW ...................................................................20

ARGUMENT ......................................................................................21

I.    THE NOTICE AND ACCESS CONDITIONS ARE *ULTRA VIRES* BECAUSE THEY EXCEED DOJ'S STATUTORY AUTHORITY AND THEY VIOLATE THE SEPARATION OF POWERS. ....................21

    A.    The Byrne JAG Statute Precludes The Notice And Access Conditions. ......................................................21

        1.    The text, structure, and purpose of the Byrne JAG statute foreclose DOJ's imposition of the Notice and Access Conditions. ......................................................22

2. DOJ's new arguments on appeal fail. ........................................29

B. Section 10102(a)(6) Does Not Authorize The Notice And
Access Conditions. ................................................................32

1. Section 10102(a)(6) does not expand the Assistant
Attorney General's powers. .......................................33

2. DOJ's interpretation is fatally flawed because it would
render superfluous a host of other statutory provisions............37

3. "Special Conditions" is a term of art in federal funding
that is limited to high-risk grantees............................41

4. Requiring DOJ to comply with Congress's intent will not
nullify other Byrne JAG conditions...........................43

C. Federalism Principles Require A Clear Statement Before DOJ
Can Impose The Notice And Access Conditions...............................46

D. The INA Does Not Authorize DOJ's New Notice and Access
Conditions. .............................................................49

II. DOJ'S IMPOSITION OF THE NOTICE AND ACCESS
CONDITIONS VIOLATES THE SPENDING CLAUSE. ..........................53

III. DOJ'S IMPOSITION OF THE NOTICE AND ACCESS
CONDITIONS VIOLATES THE ADMINISTRATIVE
PROCEDURE ACT....................................................55

CONCLUSION ...................................................57

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

STATUTORY ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alliance for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ...........................................................20

*Arizona v. United States*,
567 U.S. 387 (2012)...........................................................................51

*Az. State Bd. for Charter Sch. v. U.S. Dep't of Educ.*,
464 F.3d 1003 (9th Cir. 2006) ...........................................................34

*Barrett v. United States*,
423 U.S. 212 (1976)...........................................................................31

*Boardman v. Pac. Seafood Grp.*,
822 F.3d 1011 (9th Cir. 2016) ...........................................................34

*Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*,
710 F.3d 946 (9th Cir. 2013) ......................................................24, 37

*City & Cty. of San Francisco v. Sessions*,
2018 WL 4859528 (N.D Cal. Oct. 5, 2018) .........................12, 25, 52

*City of Arlington v. FCC*,
569 U.S. 290 (2013)...........................................................................21

*City of Chicago v. Sessions*,
264 F. Supp. 3d 933 (N.D. Ill. 2017)..................................................39

*City of Chicago v. Sessions*,
321 F. Supp. 3d 855 (N.D. Ill. 2018)....................................12, 52, 57

*City of Chicago v. Sessions*,
888 F.3d 272 (7th Cir. 2018) ......................................................*passim*

*City of Chicago v. Sessions*,
No. 17-2991, Dkt. No. 134 (7th Cir. June 26, 2018) (en banc)..........11

*City of Evanston v. Sessions*,
No. 18-C-4853 (N.D. Ill. Aug. 9, 2018) ......................................11, 12

*City of Los Angeles v. McLaughlin*,
  865 F.2d 1084 (9th Cir. 1989) ........................................................6, 24

*City of Philadelphia v. Sessions*,
  280 F. Supp. 3d 579 (E.D. Pa. 2017) ...................................................41

*City of Philadelphia v. Sessions*,
  309 F. Supp. 3d 289 (E.D. Pa. 2018) ...........................................11, 52

*Ely v. Velde*,
  451 F.2d 1130 (4th Cir. 1971) ............................................................48

*Encino Motorcars, LLC v. Navarro*,
  136 S. Ct. 2117 (2016) ........................................................................56

*Enyart v. Nat'l Conference of Bar Exam'rs, Inc.*,
  630 F.3d 1153 (9th Cir. 2011) ............................................................53

*Forest Grove Sch. Dist. v. T.A.*,
  557 U.S. 230 (2009) .............................................................................40

*Genuine Parts Co. v. EPA*,
  890 F.3d 304 (D.C. Cir. 2018) ............................................................57

*Gonzales v. Oregon*,
  546 U.S. 243 (2006) .............................................................................38

*Gregory v. Ashcroft*,
  501 U.S. 452 (1991) .....................................................................19, 46

*Hillis v. Heineman*,
  626 F.3d 1014 (9th Cir. 2010) ............................................................30

*Jama v. Immigration & Customs Enforcement*,
  543 U.S. 335 (2005) .............................................................................26

*Landis v. N. Am. Co.*,
  299 U.S. 248 (1936) .............................................................................12

*Louisiana Pub. Serv. Comm'n v. FCC*,
  476 U.S. 355 (1986) .............................................................................21

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) ................................................................55

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins.
Co.*,
    463 U.S. 29 (1983).............................................................................57

*Murphy v. NCAA*,
    138 S. Ct. 1461 (2018).......................................................................48

*Nevada v. Skinner*,
    884 F.2d 445 (9th Cir. 1989) ..............................................................53

*New York v. U.S. Dep't of Justice*,
    2018 WL 6257693 (S.D.N.Y. Nov. 30, 2018)............................12, 52

*New York v. United States*,
    505 U.S. 144 (1992)...........................................................................53

*P. C. Pfeiffer Co. v. Ford*,
    444 U.S. 69 (1979).............................................................................35

*S. Ry. Co. v. I. C. C.*,
    553 F.2d 1345 (D.C. Cir. 1977)..........................................................45

*San Francisco v. Trump*,
    897 F.3d 1225 (9th Cir. 2018) .................................................9, 21, 28

*Sever v. NLRB*,
    231 F.3d 1156 (9th Cir. 2000) ............................................................56

*South Dakota v. Dole*,
    483 U.S. 203 (1987)...........................................................................53

*U.S. Conference of Mayors v. Sessions*,
    No. 18-2734 (7th Cir. 2018) ...............................................................12

*United States v. Wilson*,
    503 U.S. 329 (1992)...........................................................................31

*United States v. Youssef*,
    547 F.3d 1090 (9th Cir. 2008) ............................................................27

*Util. Air Regulatory Grp. v. EPA*,
    134 S. Ct. 2427 (2014)...................................................................25, 29, 36, 44

*Va. Dep't of Educ. v. Riley*,
    106 F.3d 559 (4th Cir. 1997) (en banc) ........................................46, 47

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001)........................................................................35, 36

*Williams v. King*,
    875 F.3d 500 (9th Cir. 2017) ........................................................41, 42

## Constitutional Provisions

U.S. Const. art. I, § 8, cl. 1......................................................................53

U.S. Const. amend. X....................................................................47, 48, 52

## Statutes

5 U.S.C. § 706(2)(A)..................................................................................55

8 U.S.C. § 1231(i)......................................................................................52

8 U.S.C. § 1252c........................................................................................51

8 U.S.C. § 1373..........................................................................................52

20 U.S.C. § 1416(e) ...................................................................................42

34 U.S.C. § 10102(a)(1)-(5)......................................................................33

34 U.S.C. § 10102(a)(6)....................................................................*passim*

34 U.S.C. § 10141...............................................................................26, 39

34 U.S.C. § 10142.........................................................................26, 39, 40

34 U.S.C. §§ 10151-58 ...........................................................................5, 22

34 U.S.C. § 10152(a)(1)...........................................................5, 6, 27, 54

34 U.S.C. § 10152(d) .................................................................................45

34 U.S.C. § 10153(a)(1)-(5).......................................................................7

34 U.S.C. § 10153(a)(1)-(6) ...................................................................22

34 U.S.C. § 10153(a)(4) ..............................................8, 29, 30, 37, 45

34 U.S.C. § 10153(a)(5)(C) ..........................................................29, 30

34 U.S.C. § 10153(a)(5)(D) ..........................................................31, 44

34 U.S.C. § 10153(b) ...........................................................................45

34 U.S.C. § 10156 ........................................................6, 24, 25, 54

34 U.S.C. § 10157 ........................................................7, 25, 37

34 U.S.C. § 10202 ...............................................................................44

34 U.S.C. § 10228 ........................................................................48, 49

34 U.S.C. § 10224 ...............................................................................40

34 U.S.C. § 10446 ........................................................................26, 40

34 U.S.C. § 20927 ........................................................................23, 38

34 U.S.C. § 30307 ...............................................................................23

34 U.S.C. § 40914 ........................................................7, 23, 37

34 U.S.C. § 60105 ........................................................7, 23, 38

42 U.S.C. § 913 ...................................................................................33

42 U.S.C. § 2000d-4a ...................................................................11, 32

42 U.S.C. § 3573(a)(11) (2000), *repealed* .............................................22

Pub. L. No. 108-446, 118 Stat. 2647 (2004).........................................42

Pub. L. No. 109-162, § 1111, 119 Stat. 2960 (2006)........................22, 23

## REGULATORY AUTHORITIES

2 C.F.R. § 200.205(b) .........................................................................43

2 C.F.R. § 2800.101 ............................................................................43

8 C.F.R. § 287.7(a) ................................................................51

28 C.F.R. § 46.103(a) .............................................................45

28 C.F.R. § 66.12 ...............................................................41, 42

**OTHER LEGISLATIVE AUTHORITIES**

Build the Wall, Enforce the Law Act of 2018, H.R. 7059, 115th Cong.
(2018) ................................................................................28

Enforce the Law for Sanctuary Cities Act, H.R. 3009, 114th Cong.
(2015) ................................................................................28

*Controlling Crime Through More Effective Law Enforcement:*
*Hearings Before the Subcomm. on Criminal Laws and Procedure*
*of the S. Comm. on the Judiciary*, 90th Cong. (1967) .......................49

H.R. Rep. No. 109-233 (2005) ..............................................5, 23, 27, 54

No Sanctuary for Criminals Act, H.R. 3003, 115th Cong. (2017) .........28

Stop Sanctuary Cities Act, S. 1814, 114th Cong. (2015) .......................27

S. Rep. No. 90-1097, 1968 U.S.C.C.A.N. 2112 (1968) ..........................48

**OTHER SOURCES**

Br. of United States, *Commonwealth of Massachusetts v.*
*Environmental Protection Agency*,
No. 05-1120, 2006 WL 3043970 (U.S. Oct. 24, 2006) .....................35

Br. of United States, *Nielsen v. Preap*,
No. 16-1363, 2018 WL 2554770 (U.S. June 1, 2018) ......................52

## INTRODUCTION

The Edward Byrne Memorial Justice Assistance Grant ("Byrne JAG") program is a formula grant Congress created to provide States and localities with flexibility to address their local criminal justice problems. The Department of Justice ("DOJ"), however, is attempting unlawfully to transform that program into a tool to pressure those local jurisdictions to adopt DOJ's policy priorities on questions of federal immigration enforcement.

For fiscal year 2017, DOJ has conditioned its award of Byrne JAG funds on recipient States and localities diverting their law enforcement resources away from their local priorities and instead toward engaging in federal civil immigration enforcement. Specifically, despite lacking congressional authorization to impose immigration conditions, DOJ requires that States and localities must, to receive funds, (1) provide notice to the Department of Homeland Security ("DHS") upon request before releasing from a correctional facility any particular noncitizen and (2) provide access to their correctional facilities for DHS officials to interview detainees that DHS "believes" to be noncitizens.

DOJ's Conditions are *ultra vires*. They violate the Constitution's Spending Clause. And they are arbitrary and capricious. Every court to consider them has held that DOJ does not have the power to impose them.

- 1 -

But DOJ has imposed these Conditions on all Byrne JAG applicants. In contravention of Congress's purpose that Byrne JAG funds be used for States and localities to devise their own programs tailored to their local criminal justice needs, DOJ requires all applicants to adopt a one-size-fits-all federal civil immigration enforcement policy. In the case of Los Angeles, Byrne JAG funds support the salaries of prosecutors and probation officers in a targeted program to combat local crime. DOJ wishes to deny Los Angeles such funds if it is not willing to change its local law enforcement policies and certify that it has adopted ordinances or policies that satisfy the Conditions.

The Byrne JAG statute does not permit the Attorney General to wield grant funds—intended to support local criminal justice efforts—as a weapon to extract State and local participation in federal civil immigration enforcement. In structuring the program as a formula grant, Congress created specific eligibility criteria and a formula to allocate funds among all jurisdictions that meet those criteria. Congress further crafted narrow grounds on which the Attorney General is authorized to withhold grant funds to jurisdictions not supporting specific federal priorities— participation in immigration enforcement not among them. The statute contains no authority, general or specific, for the Attorney General to disrupt the near-automatic funding of the Byrne JAG program by requiring States and localities to devote resources toward participating in federal immigration enforcement.

Indeed, as the Seventh Circuit concluded, "it is inconceivable that Congress would have anticipated that the Assistant Attorney General could abrogate the entire distribution scheme and deny all funds to states and localities that would qualify under the Byrne JAG statutory provisions, based on the Assistant Attorney General's decision to impose his or her own conditions." *City of Chicago v. Sessions*, 888 F.3d 272, 286 (7th Cir. 2018). The implications of DOJ's power grab are stark. Under its new view of its authority, DOJ has not identified any statutory limiting principle, meaning that DOJ could use Byrne JAG funds however it sees fit, in this and future Administrations, to pressure States and localities to adopt as local policy other priorities of DOJ's choosing, from relaxing or strengthening marijuana laws to abolishing or imposing capital punishment. And the consequences would not be limited to the Byrne JAG program. DOJ's primary argument is that the Assistant Attorney General has the authority to place any condition, "at a minimum," DOJ Br. 17, on all federal grants administered by the Office of Justice Programs. This Court should reject DOJ's attempt to usurp the legislative power and turn Congress's grants, including the carefully tailored Byrne JAG formula grant at issue here, into mandates for imposing federal Executive Branch policies on unwilling States and local governments.

## JURISDICTIONAL STATEMENT

Los Angeles agrees with the appellants' jurisdictional statement.

## ISSUES PRESENTED

In administering a formula grant that Congress created for the purpose of providing States and localities with flexibility in addressing their local criminal justice problems, DOJ has abandoned Congress's virtually automatic formula by requiring, as a condition of receiving grant funds, that States and localities participate in federal civil immigration enforcement. As relevant here, DOJ requires States and localities to: (1) provide notice, as early as practicable upon request, to federal immigration officials before releasing a particular noncitizen from a detention facility ("Notice Condition") and (2) provide federal immigration officials with access to detention facilities to interview individuals DHS believes to be noncitizens ("Access Condition"). The issues presented are:

1.  Whether the Notice and Access Conditions are *ultra vires* because they exceed the authority that Congress accorded DOJ under the Byrne JAG formula grant program.

2.  Whether the Notice and Access Conditions violate the Spending Clause.

3.  Whether the decision to adopt the Notice and Access Conditions was arbitrary and capricious.

## STATUTES AND REGULATIONS INVOLVED

All applicable statutes are contained in the addendum of Defendants' opening brief, or the supplemental addendum to this brief.

## STATEMENT OF THE CASE

### A. Congress Established The Byrne JAG Program As A Formula Grant For Local Criminal Justice Funding

Congress enacted the Byrne JAG program to provide States and localities with federal funding to help address their local criminal justice needs. *See* 34 U.S.C. §§ 10151-58. Its goal was to give jurisdictions "more flexibility to spend money for programs that work for them rather than to impose a 'one size fits all' solution." H.R. Rep. No. 109-233, at 89 (2005). The Byrne JAG program is now the "primary provider of federal criminal justice funding to state and local governments." *Chicago*, 888 F.3d at 278.

Under Congress's statutory framework, Byrne JAG grants may be used "to provide additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice." 34 U.S.C. § 10152(a)(1). Congress specified that these funds could be used "for any one or more of the following programs":

- "Law enforcement programs."

- "Prosecution and court programs."

- "Prevention and education programs."

- "Corrections and community corrections programs."

- "Drug treatment and enforcement programs."

- "Planning, evaluation, and technology improvement programs."

- "Crime victim and witness programs (other than compensation)."

- "Mental health programs and related law enforcement and corrections programs, including behavioral programs and crisis intervention teams."

*Id.* § 10152(a)(1)(A)-(H). Congress did not suggest that federal civil immigration enforcement would be a local criminal justice responsibility.

To ensure that all States and localities can access these funds, Congress required grants to be allocated "in accordance with the formula established" by the statute. *Id.* § 10152(a)(1); *see also id.* § 10156. Formula grants "are not awarded at the discretion of a state or federal agency, but are awarded pursuant to a statutory formula." *City of Los Angeles v. McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989). Under the formula enacted by Congress, the Attorney General "shall . . . allocate" 50 percent of available funds to each State in amounts proportionate to its population, with the remaining 50 percent allocated to each State in amounts proportionate to its rate of violent crime. 34 U.S.C. § 10156(a)(1)(A)-(B). Congress also guaranteed each State a minimum allocation of Byrne JAG funds. *Id.* § 10156(a)(2). Of the amount allocated to an individual State, 60 percent is a direct grant to the State, and 40 percent is for grants to local governments. *Id.* § 10156(b)(2), (d).

Consistent with the Byrne JAG's formula-grant structure, Congress prescribed the limited circumstances in which deviation from the allocation formula

is authorized. For instance, the Attorney General may reserve "not more than 5 percent" of Byrne JAG funds for jurisdictions that experience "precipitous or extraordinary increases in crime," or face "significant programmatic harm resulting from operation of the formula." *Id.* § 10157(b). Congress has also authorized the Attorney General to reduce Byrne JAG awards in a limited manner when jurisdictions fail to comply with specific federal policy objectives. *See, e.g.*, *id.* § 40914(b)(1) (Attorney General "may" withhold no more than 3 or 4 percent of Byrne JAG funds from States for not providing a minimum percentage of criminal records under National Instant Criminal Background Check System); *id.* § 60105(c)(2) (Attorney General has "discretion" to reduce Byrne JAG allocation by "not more than . . . 10-percent" for failure to comply with Death in Custody Reporting Act). None of these enumerated federal objectives concerns immigration enforcement.

Congress also specified the content of grant applications for communities to establish their eligibility for a share of Byrne JAG funding. Congress required each applicant to make certain certifications and assurances, none of which concern federal immigration enforcement. *See id.* § 10153(a)(1)-(5). For example, an applicant must certify that its Byrne JAG funds will not be used to "supplant State or local funds, but will be used to increase the amounts of such funds that would, in the absence of Federal funds, be made available for law enforcement activities." *Id.*

- 7 -

§ 10153(a)(1). The applicant also must certify that it will "comply with all provisions of [the Byrne JAG statute] and all other applicable Federal laws," and it must assure that, for each fiscal year, it will "maintain and report such data, records, and information (programmatic and financial)" as the Attorney General may "reasonably require." *Id.* § 10153(a)(4), (5). Congress gave the Attorney General discretion over the "form," not the content, of the application. *Id.* § 10153(a).

### B. DOJ Has Imposed New Conditions On Byrne JAG Awards To Require State And Local Government Recipients To Participate In Federal Civil Immigration Enforcement

Just one month after taking office, President Donald J. Trump declared that he would use federal funds as a "weapon" to demand State and local support for his federal civil immigration enforcement policies.[1] To implement this edict, the Department of Justice has attempted to condition States' and localities' receipt of federal grants on enforcement of federal civil immigration law.

On January 25, 2017, President Trump issued Executive Order 13768, directing the Attorney General and Secretary of Homeland Security to withhold federal funds from so-called "Sanctuary Jurisdictions."[2] This Court has affirmed a

---

[1] Harriet Taylor, "Trump to Fox News: I May Defund California as 'a weapon' to fight illegal immigration," CNBC.com (Feb. 5, 2017), https://tinyurl.com/TaylorCNBC.

[2] The White House Office of the Press Secretary, "Executive Order: Enhancing Public Safety in the Interior of the United States," Whitehouse.gov (January 25,

permanent injunction against Section 9(a) of the Executive Order, ruling that it violated the Constitution's separation of powers. *San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018).

The Byrne JAG program was next. In July 2017, Attorney General Sessions announced in a press release that "[a]s part of accomplishing the Department of Justice's top priority of reducing violent crime, we must encourage these 'sanctuary' jurisdictions to change their policies and partner with federal law enforcement to remove criminals." ER63. Without identifying any factual basis, the Attorney General asserted that "[s]o-called 'sanctuary' policies make all of us less safe because they intentionally undermine our laws and protect illegal aliens who have committed crimes." *Id.* The Attorney General directed that DOJ award Byrne JAG funds only to cities and States that "allow federal immigration access to detention facilities," and "provide 48 hours notice [to federal immigration officers] before they release an illegal alien wanted by federal authorities." *Id.* DOJ had never previously attempted to impose such conditions on Congress's Byrne JAG formula grant.

Following the Attorney General's directive, the final 2017 Byrne JAG awards required localities to certify that they have a "local ordinance, -rule, -regulation, -

---

2017), § 9(a), *available at* https://www.whitehouse.gov/presidential-actions/executive-order-enhancing-public-safety-interior-united-states/.

policy, or -practice (or an applicable State statute, -rule, -regulation, -policy, or -practice)" that is "designed to ensure" that:

> "agents of the United States acting under color of federal law in fact are given access [to] a local-government (or local government-contracted) correctional facility for the purpose of permitting such agents to meet with individuals who are (or are believed by such agents to be) aliens and to inquire as to such individuals' right to be or remain in the United States" (the "Access Condition"),
>
> and
>
> "when a local-government (or local-government contracted) correctional facility receives from DHS a formal written request authorized by the Immigration and Nationality Act that seeks advance notice of the scheduled release date and time for a particular alien in such facility, then such facility will honor such request and — as early as practicable (see 'Rules of Construction' incorporated by para. 4.B. of this condition) — provide the requested notice to DHS" (the "Notice Condition").

Greenville Award, ER26 ¶ 56(1).[3]

The Notice and Access Conditions are imposed on all applicants and apply to the "program or activity" funded by the award. ER26 ¶ 56(1). Under established law that is incorporated expressly into the Byrne JAG award documents, the covered "program or activity" consists of "*all* of the operations of" either "a department, agency, special purpose district, or other instrumentality of a State or of a local

---

[3] Following the entry of the preliminary injunction in this case, Los Angeles received its award, which contains identical conditions.

government" that is receiving the federal assistance, or "the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government." 42 U.S.C. § 2000d-4a(1) (emphasis added); ER23 ¶ 53(5)(A)(3) (incorporating this definition). The award documents further assert that compliance with the Notice and Access Conditions is an "authorized and priority purpose" of the award, and that the federal grant funds themselves "may be obligated" for the costs of complying with those Conditions. ER26 ¶ 56(3).

In several decisions not mentioned in DOJ's brief, multiple courts have enjoined the FY 2017 Notice and Access Conditions as *ultra vires*, ruling that they are beyond the scope of DOJ authority under the statutory framework. *Chicago*, 888 F.3d 272 (preliminary injunction)[4]; *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289 (E.D. Pa. 2018) (permanent injunction), *appeal docketed*; *City of Evanston v.*

---

[4] The Seventh Circuit granted DOJ's petition to rehear en banc the district court's grant of nationwide relief and stayed the effect of the injunction as to jurisdictions outside Chicago. *City of Chicago v. Sessions*, No. 17-2991, Dkt. No. 134 (7th Cir. June 26, 2018) (en banc). The en banc Seventh Circuit did not disturb the panel's holding that Chicago is likely to succeed on the merits. The en banc court later dismissed the appeal as moot after the district court entered final judgment and a permanent injunction. *Id.* Dkt. No. 154 (Aug. 10, 2018). The Seventh Circuit rejected DOJ's motion to vacate the rest of the panel opinion. *Id.* Dkt. No. 158 (Aug. 29, 2018).

*Sessions*, No. 18-C-4853, (N.D. Ill. Aug. 9, 2018) (preliminary injunction)[5]; *City of Chicago v. Sessions*, 321 F. Supp. 3d 855 (N.D. Ill. 2018) (permanent injunction), *appeal docketed*; *City & Cty. of San Francisco v. Sessions*, 2018 WL 4859528 (N.D Cal. Oct. 5, 2018) (permanent injunction); *see also New York v. U.S. Dep't of Justice*, 2018 WL 6257693 (S.D.N.Y. Nov. 30, 2018) (permanent injunction).

### C. Los Angeles's Past Use Of Byrne JAG Funding And Its 2017 Application For This Grant Promote Critical Local Law Enforcement Objectives

Los Angeles has applied for and received Byrne JAG awards each year since FY 2005, with annual funding of upwards of $1 million. SER3 ¶ 4 (Decl. of Jeff Gorell).

In 2017, Los Angeles applied for Byrne JAG award money to help fund its Community Law Enforcement and Recovery ("CLEAR") program, which combats violent crime in local communities and neighborhoods through an aggressive

---

[5] The district court in *Evanston* granted a preliminary injunction as to all members of the U.S. Conference of Mayors, which is a co-plaintiff in that case. Los Angeles is a member of the Conference. The district court stayed the scope of its injunction as to the individual Conference members, however, based on the Seventh Circuit's decision to grant rehearing in *Chicago*. On an emergency appeal, the Seventh Circuit remanded for the district court to enter its injunction as applied to the members of the Conference of Mayors. *U.S. Conference of Mayors v. Sessions*, No. 18-2734 (7th Cir. 2018). That injunction does not moot this appeal. *See Landis v. N. Am. Co.*, 299 U.S. 248, 255-56 (1936) ("Only in rare circumstances will a litigant in one cause be compelled to stand aside while a litigant in another settles the rule of law that will define the rights of both.").

vertical prosecutorial program that includes probation and parole officers, youth intervention organizations, and schools.  SER6-10 ¶¶ 10-18.

The 2017 Byrne JAG funds would support the salaries for nine Los Angeles Deputy City Attorneys, Los Angeles County Deputy District Attorneys, and Los Angeles County Deputy Probation Officers.  ER129-34.  The City's use of Byrne JAG funds to help maintain positions in the CLEAR program promotes Congress's core objectives in enacting the Byrne JAG program.  Without Byrne JAG funding, Los Angeles would have fewer resources to support those local law enforcement efforts.

In submitting its FY 2017 application, Los Angeles did not certify compliance with the Notice and Access Conditions because Los Angeles has made a longstanding decision that it can best protect local public safety by not participating in federal civil immigration enforcement.  Los Angeles has implemented "policies and practices designed to promote the public safety of all Los Angeles residents by engendering cooperation and trust between members of the City's many immigrant communities and law enforcement."  SER15-16 ¶¶ 4-8 (Decl. of Arif Alikhan).  Certifying compliance with the Notice and Access Conditions would have "a negative impact on LAPD's [Los Angeles Police Department's] relationship with the immigrant communities it polices, causing those communities to be less willing

to report crimes and cooperate with criminal investigations, thus threatening the public safety of all who live and work in Los Angeles." SER18-19 ¶ 16.

Furthermore, LAPD could not comply with the Access Condition as DOJ has interpreted it. LAPD only permits "access to LAPD detention facilities to interview individual arrestees . . . consistent with California law which requires obtaining informed, written consent" from the arrestee before any such interview. SER19-20 ¶ 20. Absent such consent, "LAPD does not provide DHS or ICE personnel access to its facilities in order to interview that individual." *Id.* At the time of its complaint, the City could not ascertain whether DOJ would regard this practice as consistent with the Conditions. But DOJ has since represented in related litigation that the Access Condition "require[s] allowing access . . . even if the inmate might decline to answer questions," which Los Angeles does not do. *City of Philadelphia v. Sessions*, Defs.' Mem. in Opp. to Pl.'s Mot. for Pre. Inj. at 32, No. 17-cv-03894 (filed E.D. Pa. Oct. 12, 2017), Dkt. 28. The only way Los Angeles could comply with DOJ's new Conditions on Byrne JAG funds is by adopting different local governmental law enforcement priorities to accommodate DOJ's federal immigration demands.

### D. Procedural Background

On September 29, 2017, the City filed a complaint seeking, among other things, a declaration that the Notice and Access Conditions were unlawful, and an

injunction to block DOJ from using the unlawful Notice and Access Conditions in awarding Los Angeles's FY 2017 Byrne JAG funds. D. Ct. Dkt. No. 1.[6] In light of the program-wide injunction imposed by the district court and affirmed by the Seventh Circuit in the *Chicago* case that was in effect at the time, and with agreement of the parties, the District Court stayed proceedings on the Byrne JAG claims. D. Ct. Dkt. No. 52. After the Seventh Circuit vacated the nationwide portion of its *Chicago* opinion, however, Los Angeles moved for a preliminary injunction on July 18, 2018, as DOJ had still not awarded Los Angeles's statutorily authorized Byrne JAG award for FY 2017. D. Ct. Dkt. No. 83. On July 27, 2018, DOJ moved to dismiss Los Angeles's Byrne JAG claims. D. Ct. Dkt. No. 85.

The district court granted the preliminary injunction and denied DOJ's motion to dismiss. ER1; D. Ct. Dkt. No. 94. In granting the preliminary injunction, the court held that Congress "granted the Attorney General the power to carry out very limited actions" in the Byrne JAG statute, and did not "'grant the Attorney General the authority to impose conditions that require states or local governments to assist in immigration enforcement, nor to deny funds to states or local governments for the failure to comply with those conditions.'" ER3 (quoting *Chicago*, 888 F.3d at 284).

---

[6] Los Angeles's complaint also challenged the new considerations imposed by DOJ on the Community Oriented Policing Services discretionary grant program. That part of the case is on appeal to this Court, which heard oral argument on August 30, 2018. *See City of Los Angeles v. Sessions*, No. 18-55599 (9th Cir.).

Like every court to address the issue, the district court rejected DOJ's reliance on 34 U.S.C. § 10102(a)(6), because DOJ's reading "contradicts the explicit grants of authority in other sections of the statute." ER4. The court also held that Los Angeles would suffer irreparable injury absent the injunction and that the balance of the equities and the public interest weighed in Los Angeles's favor. ER4-5.

On October 4, 2018, Los Angeles received its FY 2017 Byrne JAG award document, but that document still contained the enjoined Notice and Access Conditions. According to DOJ's website, "DOJ has determined that, at this time, it will not use or enforce those conditions in FY 2017 JAG awards to California or its political subdivisions." FY 2017 and FY 2018 JAG Award Special Notices, https://www.bja.gov/jag/award-conditions.html (last accessed Nov. 30, 2018). DOJ represented that "[i]f the posture of the pending litigation changes (or if the pending litigation is resolved) in a manner that would permit DOJ to use or enforce" the Notice and Access Conditions "in the FY 2017 JAG awards to the State or its subdivisions, then DOJ will provide them with specific, formal, written notice of DOJ's intent to use or enforce those conditions following the notice." *Id.*

## SUMMARY OF ARGUMENT

I.     The Notice and Access Conditions are *ultra vires* because they exceed the authority of DOJ under the statute and they violate the separation of powers.

A.  Congress structured the Byrne JAG grant as a formula grant, setting out the eligibility criteria for jurisdictions and the exact allocation of funds, while carefully limiting the Attorney General's authority to impose conditions, and specifying circumstances that require adherence to different federal provisions or policies as a basis for altering the formula's allocation of funding.  In the certifications and assurances that Congress allowed to be imposed on grant applicants, it did not include any federal immigration condition.  When Congress has conditioned Byrne JAG funds on compliance with federal policy objectives, it has made its intentions clear.

The Seventh Circuit correctly held that it would be "inconceivable" that Congress would allow the Attorney General to undermine Congress's formula based on his own federal immigration conditions.  Congress's purpose in enacting the Byrne JAG program—to give States and localities flexibility in solving their local problems—is at odds with DOJ's imposition of a one-size-fits-all federal immigration-enforcement mandate on Byrne JAG grantees.

DOJ's new interpretation of its authority includes no limitations that would preclude DOJ in this or future Administrations from using the authority to condition Byrne JAG funds to require relaxing or strengthening marijuana laws, abolishing or imposing capital punishment, or an infinite array of other policies.

B.  34 U.S.C. § 10102(a)(6) does not authorize DOJ's imposition of the Notice and Access Conditions on Byrne JAG awards.  Section 10102(a)(6) is not part of the Byrne JAG statute; it is a residual clause in a list of powers delegated to the Assistant Attorney General, and it states only that the Assistant Attorney General shall "exercise such other powers and functions as may be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General, including placing special conditions on all grants[.]"  As every court that has analyzed section 10102(a)(6) has held, it is not an independent grant of authority.  The plain meaning of "including"—referring to a subset of a larger group—shows that "including placing special conditions" refers to authority already vested in the Assistant Attorney General elsewhere in Chapter 101 or by delegation of the Attorney General.  Congress does not hide elephants in mouseholes, and it did not hide in this ancillary provision a sweeping authority to make significant policy demands on States and localities in exchange for their statutory share of a formula grant.  Furthermore, DOJ's interpretation would render superfluous a whole host of provisions in the Byrne JAG statute and across the U.S. Code.

Any reading of section 10102(a)(6) to constitute an independent delegation of power could not, in any event, support DOJ's broad clam of authority here because it defies the meaning of "special conditions."  That term of art refers to conditions

on high-risk grantees, as reflected in regulations in force at the time Congress enacted section 10102(6).

DOJ makes the hyperbolic assertion that if the Court does not accept its immigration conditions, then myriad other conditions, not at issue in this litigation, would be unlawful. But DOJ offers no evidence that it invoked section 10102(a)(6) for such conditions in the past, and a review of the Byrne JAG statute shows that many, if not all, the conditions that DOJ discusses are authorized by other specific statutory or regulatory provisions.

C. Section 10102(a)(6) also cannot meet the clear statement from Congress that is constitutionally required when a federal agency seeks to intrude on core powers of State and local sovereignty. *See Gregory v. Ashcroft*, 501 U.S. 452 (1991). The Notice and Access Conditions require Los Angeles to abandon local law enforcement policies that it has determined are necessary for the public safety of its residents. Congress would have to have spoken much more clearly to authorize such conditions.

D. DOJ suggests that the Immigration and Nationality Act ("INA") justifies its new Notice and Access Conditions on Byrne JAG funds. DOJ asserts that the Notice and Access Conditions, require only "basic" or "modest" cooperation, but nothing in the INA requires (or could require) States and localities to "cooperate" in this way.

II.  The Notice and Access Conditions also violate the relatedness requirement of the Spending Clause.  There is no relationship between Congress's enactment of the Byrne JAG formula grant program to provide States and localities with flexibility to address their local criminal justice problems, and mandating the recipients to adhere to the Notice and Access Conditions to participate in federal civil immigration enforcement.

III.  The imposition of the Notice and Access Conditions was arbitrary and capricious, in violation of the Administrative Procedure Act.  In imposing the Conditions, the Attorney General warned in a press release about the dangers of so-called "sanctuary" cities.  But DOJ acted without evidence, much less evidence of a purported connection between the Notice and Access Conditions and Byrne JAG funds.  Indeed, DOJ has ignored substantial contrary evidence that undermines the purported rationale.

## STANDARD OF REVIEW

A preliminary injunction is warranted where a plaintiff establishes that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (citation omitted).  DOJ challenges only the district

court's legal conclusion that the Notice and Access Conditions are unlawful, review of which is *de novo*.

## ARGUMENT

## I. THE NOTICE AND ACCESS CONDITIONS ARE *ULTRA VIRES* BECAUSE THEY EXCEED DOJ'S STATUTORY AUTHORITY AND THEY VIOLATE THE SEPARATION OF POWERS.

An agency "has no power to act . . . unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986); *see also City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). Moreover, where Congress does "not authorize withholding of funds," the Executive Branch's decision to do so "violates the constitutional principle of the Separation of Powers." *San Francisco*, 897 F.3d at 1235. Here, DOJ lacks authority to impose the Notice and Access Conditions, and its action doing so is *ultra vires*.

### A. The Byrne JAG Statute Precludes The Notice And Access Conditions.

Before the district court, DOJ eschewed reliance on the provisions of the Byrne JAG statute as its justification for the Notice and Access Conditions. *See* SER32-35 (D.Ct. Dkt. 86 12-15). And for good reason. The text, structure, and purposes of the Byrne JAG statute show that Congress foreclosed the Notice and Access Conditions. On appeal, DOJ suggests for the first time that two provisions in the Byrne JAG statute authorize the Conditions. But that new argument fails, not just because it is waived, but also on the merits.

1.  **The text, structure, and purpose of the Byrne JAG statute foreclose DOJ's imposition of the Notice and Access Conditions.**

The Byrne JAG statute does not grant DOJ broad authority to impose any conditions on the grants. Instead, Congress required Byrne JAG applicants to provide specific certifications and assurances as conditions to receiving Byrne JAG funds. *See* 34 U.S.C. § 10153(a)(1)-(6). Neither those certifications and assurances, nor any other part of the Byrne JAG statute, mentions civil-immigration conditions, much less the Notice and Access Conditions. *See id.* §§ 10151-58.

When Congress has wanted Byrne JAG applicants to certify compliance with federal immigration priorities, it has made its intentions clear. A predecessor to the Byrne JAG program required applicants to provide an "assurance" that States would submit "a plan under which the State will provide without fee to the Immigration and Naturalization Service, within 30 days of the date of their conviction, notice of conviction of aliens who have been convicted of violating the criminal laws of the State." 42 U.S.C. § 3573(a)(11) (2000), *repealed* (2006); *id.* § 3570 (2000) (grant programs titled "Edward Byrne Memorial State and Local Law Enforcement Assistance Programs"),[7] *repealed* (2006). In enacting the current Byrne JAG

---

[7] The Edward Byrne Memorial State and Local Law Enforcement Assistance Programs and Local Law Enforcement Block Grants Program were merged to create the current Byrne JAG program in 2006. *See* Pub. L. No. 109-162, § 1111, 119 Stat.

program, however, Congress repealed that condition. *See* Pub. L. No. 109-162, § 1111, 119 Stat. 2960, 3094 (2006).

In other instances where Congress has authorized or required the Attorney General to condition Byrne JAG funding on a jurisdiction's compliance with federal policy objectives, it has been equally clear. States that "fail[] to comply with" the Death in Custody Reporting Act, "shall, at the discretion of the Attorney General," lose up to "10-percent" of their Byrne JAG funds. 34 U.S.C. § 60105(c)(2). Likewise, the Attorney General "may" withhold up to 3 or 4 percent of Byrne JAG funds from jurisdictions that do not abide by the standards in the National Instant Criminal Background Check System. *Id.* § 40914(b)(1).[8] Where States do not comply with the Prison Rape Elimination Act, Congress directed the Attorney General to "reduce[] by 5 percent" Byrne JAG funds that such States would "receive for prison purposes." *Id.* § 30307(e)(2). States "shall not receive 10 percent of" Byrne JAG funds if they "fail[], as determined by the Attorney General, to substantially implement" the Sex Offender Registration and Notification Act. *Id.* § 20927(a). And Congress required that "[p]ursuant to regulations promulgated by

---

2960, 3094 (2006). Part of Congress's goal in merging the programs was to "lessen the administrative burden of applying for the grants." H.R. Rep. No. 109-233 at 89.

[8] Congress further specified that, after the initial seven-year period in which the Attorney General "may" withhold Byrne JAG funds, the Attorney General must reduce Byrne JAG funds if States fail to comply with the Act, subject to the Attorney General's waiver authority, 34 U.S.C. § 40914(b)(2)-(3).

the Attorney General," States that release certain prisoners early must reimburse, using their Byrne JAG funds, other States' costs for later imprisoning those individuals for certain offenses. *Id.* § 12113(c), (e).

Congress thus knows quite well how to authorize DOJ to withhold Byrne JAG funds based on specifically identified aspects of an applicant's law enforcement practices. But there is no provision that conditions any—let alone all—Byrne JAG funds on compliance with the Notice and Access Conditions. If the Attorney General possessed the authority to impose whatever conditions he wanted on the receipt of Byrne JAG funds, those specific congressional enactments would be superfluous. *See Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946, 966 (9th Cir. 2013) ("It is a well-established rule of statutory construction that courts should not interpret statutes in a way that renders a provision superfluous."); *see also infra* pp. 37-41.

These explicit limits on the Attorney General's authority to condition Byrne JAG awards are consistent with Congress's decision to structure the program as a formula grant. Congress crafted a detailed formula for distributing funds based on objective factors like population and rates of violent crime, while also guaranteeing a minimum allocation to all jurisdictions that meet the statutory requirements. *See* 34 U.S.C. § 10156(a); *McLaughlin*, 865 F.2d at 1088 ("In the formula grant program the authorizing Act of Congress determines who the recipients are and how much

money each shall receive." (citation omitted)). As with his power to impose conditions, the Attorney General's authority to reallocate awards under other provisions of the statute is limited; for instance, he may reserve up to five percent of funds for jurisdictions that are harmed by the formula or have extraordinary increases in crime. 34 U.S.C. § 10157(b).

Allowing DOJ to undermine this congressionally authorized funding to support local criminal justice efforts where States or localities decline to participate in federal civil immigration investigations would disrupt the virtually automatic funding formula Congress enacted. *See Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2442 (2014) ("[A]n agency interpretation that is inconsistent with the design and structure of the statute as a whole . . . does not merit deference." (citation omitted)). In fact, DOJ's Conditions would have the effect of cutting entire States out of Congress's funding formula, contrary to Congress's explicit guarantee of a minimum allocation to each State. *See* 34 U.S.C. § 10156(a)(2); *San Francisco*, 2018 WL 4859528, at *1 ("[DOJ] continues to withhold grant funding to six states and several local jurisdictions, including California and San Francisco, which it believes do not comply with the Byrne JAG program conditions for fiscal year 2017."). The Seventh Circuit correctly held that it would be "inconceivable that Congress would have anticipated that the Assistant Attorney General could abrogate the entire distribution scheme and deny all funds to states and localities that would

- 25 -

qualify under the Byrne JAG statutory provisions, based on the Assistant Attorney General's decision to impose his or her own conditions." *Chicago*, 888 F.3d at 286.

To make matters even clearer, the Byrne JAG statutory structure is missing the broad delegations of authority to impose conditions that Congress included in other grants administered by the Attorney General and Assistant Attorney General for the Office of Justice Programs. In a provision neighboring the Byrne JAG statute, Congress expressly authorized the Assistant Attorney General to impose "terms and conditions" on specified Bureau of Justice Assistance discretionary grants. *See* 34 U.S.C. § 10142(2).[9] Elsewhere in the same Chapter, Congress empowered the Attorney General to attach "reasonable conditions" on grants to combat violent crimes against women. *See id.* § 10446(e)(3).[10] Courts do not "lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply," *Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 341 (2005), and this Court has looked to "Congress's omission" of language from provisions "located within" the same Chapter of the U.S. Code as

---

[9] Congress transferred the functions of the Director of Bureau of Justice Assistance to the Assistant Attorney General for the Office of Justice Programs, with exceptions not relevant here. *See* 34 U.S.C. § 10141 note; *id* § 10142 note.

[10] Los Angeles does not concede that the Notice and Access Conditions would be permissible under sections 10142 or 10446, but instead argues only that the broad delegations there stand in stark contrast to the absence of any such delegation in the Byrne JAG statutory framework.

"evidence of Congress's expressed intent," *United States v. Youssef*, 547 F.3d 1090, 1094-95 (9th Cir. 2008).

The statutory purposes further confirm that the Notice and Access Conditions are unlawful. The purpose of the Byrne JAG program is to give States and localities "more flexibility to spend money for programs that work for them." H.R. Rep. No. 109-233, at 89. Congress authorized the funds to be used "to provide additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice," including for eight different types of criminal justice programs. 34 U.S.C. § 10152(a)(1). Subverting Congress's duly enacted framework, DOJ seeks to impose a one-size-fits-all approach to State and local participation in federal immigration enforcement. To add insult to injury, DOJ requires jurisdictions to either bear the cost of complying with the Notice and Access Conditions out of their own budget or have their Byrne JAG award cover the cost of compliance—meaning less funding for the actual local criminal justice programs Congress intended communities to have flexibility to adopt. *See* ER26 ¶ 56.3.

It would be particularly anomalous to accept DOJ's imposition of the Notice and Access Conditions given that Congress has failed to enact conditions on Byrne JAG funding that would achieve many of the same aims that DOJ seeks here and would have been imposed by proposed legislation. *See, e.g.*, Stop Sanctuary Cities Act, S. 1814, 114th Cong. § 2(b)(2) (2015) (no Byrne JAG funds if jurisdiction

"fail[s] to comply with a detainer" issued by DHS); Enforce the Law for Sanctuary Cities Act, H.R. 3009, 114th Cong. § 3(b) (2015); No Sanctuary for Criminals Act, H.R. 3003, 115th Cong. § 2 (2017) (no Byrne JAG funds if jurisdiction "prohibit[s] or in any way restrict[s]" its officers from "assisting or cooperating" with federal civil immigration enforcement); Build the Wall, Enforce the Law Act of 2018, H.R. 7059, 115th Cong. § 4 (2018) (same). As this Court recognized, the "sheer amount of failed legislation on th[e] issue" of tying federal funds to state and local participation in federal civil immigration enforcement "demonstrates the importance and divisiveness of the policies in play, reinforcing the Constitution's 'unmistakable expression of a determination that legislation by the national Congress be a step-by-step, deliberate and deliberative process.'" *San Francisco*, 897 F.3d at 1234 (quoting *I.N.S. v. Chadha*, 462 U.S. 919, 959 (1983)).

The Notice and Access Conditions here implicate "important and divisive" policies of the type at issue in the *San Francisco* case enjoining the "sanctuary city" Executive Order. Under our constitutional structure, it is Congress, acting through its "step-by-step, deliberate and deliberative process," that determines the appropriate scope of conditions that can be placed on federal funding to States and localities. *Id.* By attaching the Notice and Access Conditions without Congress's express authorization, DOJ has not only "claimed for itself Congress's exclusive spending power, it has also attempted to coopt Congress's power to legislate." *Id.*

The need for Congress to speak here is all the more critical because DOJ has offered *no limits* on its new view of its authority to impose conditions on Byrne JAG funds. For FY 2017, DOJ invoked this purported authority for the first time to impose the Notice and Access Conditions. For FY 2018, DOJ added more unauthorized immigration conditions.[11] In future years, DOJ could use its new view of its authority to condition Byrne JAG funds on jurisdictions relaxing or strengthening their marijuana laws. Or DOJ may decide to pressure jurisdictions to abolish or impose capital punishment. This unchecked authority to pressure States and localities to adopt any Executive Branch policy preference, on pain of losing all Byrne JAG funding, is found nowhere in the Byrne JAG statute and should be rejected. *See Util. Air*, 134 S. Ct. at 2444.

## 2. DOJ's new arguments on appeal fail.

In apparent recognition of the force of the above points, DOJ did not argue below that the Byrne JAG statutory provisions authorized the Notice and Access Conditions. For the first time on appeal, however, DOJ suggests that the Notice Condition and Access Condition are authorized by, respectively, 34 U.S.C. § 10153(a)(4) and 34 U.S.C. § 10153(a)(5)(C). These new arguments are waived,

---

[11] *See* Byrne JAG FY 2018 Local Solicitation at 36-37, *available at* https://www.bja.gov/funding/JAGLocal18.pdf (last visited Nov. 30, 2018). Los Angeles has also challenged these conditions. *See City of Los Angeles v. Whitaker*, No. 2:18-cv-07347 (C.D. Cal. filed Aug. 22, 2018).

*Hillis v. Heineman*, 626 F.3d 1014, 1019 (9th Cir. 2010), but in any event fail on the merits.

Section 10153(a)(4), which DOJ asserts supports the Notice Condition, requires only that an applicant "maintain and report such data, records, and information (programmatic and financial) as the Attorney General may reasonably require." It does not authorize DOJ to mandate that Byrne JAG applicants provide *a different agency*, DHS, with the release date of a noncitizen detainee. The release date of a noncitizen in LAPD custody is not "programmatic" or "financial" data, records, or information. A noncitizen's release date is irrelevant to the "program" concerned (*i.e.*, the jurisdiction's tailored solution to its local criminal justice needs). Invoking section 10153(a)(4) is especially ill-fitting because it contemplates provision of information to the Attorney General, whereas the Notice Condition requires information to be provided to *DHS*, even though DHS has no role in administering the Byrne JAG awards.

DOJ is also incorrect in suggesting that the Access Condition is authorized by section 10153(a)(5)(C). That provision requires that an applicant certify that there "has been appropriate coordination with affected agencies." 34 U.S.C. § 10153(a)(5)(C). Read in context, the "coordination" the statute refers to must relate to *the grant proposal*. Congress's use of the present-perfect "has been" in section 10153(a)(5)(C) confirms that the statute is concerned with coordination

about the grant program that has happened before an applicant submits the grant application, not coordination about entirely separate matters that happens after. *See Barrett v. United States*, 423 U.S. 212, 216 (1976) (observing that "has been" "denot[es] an act that has been completed"). *Cf.* 34 U.S.C. § 10153(a)(5)(D) (applicant "will comply," meaning in the future). "Congress' use of . . . verb tense is significant" there. *United States v. Wilson*, 503 U.S. 329, 333 (1992).

Finally, DOJ's *post hoc* reliance on this provision is belied by the Office of Justice Program's solicitation for FY 2017 Byrne JAG grants, which required applicants to "[d]escribe any additional strategic planning/*coordination* efforts in which the units of local government participates with other criminal justice criminal/juvenile justice agencies in the State." ER81 (emphasis added). The solicitation—drafted before DOJ was faced with lawsuits requiring it to come up with legal authority for its conditions—confirms the common-sense interpretation of the statute as requiring "coordination" with relevant State or local agencies regarding the proposed grant program, not *federal* agencies regarding civil immigration enforcement.

Also for the first time on appeal, DOJ attempts to minimize the significance of the Notice and Access Conditions by implying that they are limited in their scope because they apply only to the "'program or activity' funded by the grant." DOJ Br. 14. Such a limitation would not transform the Conditions into legally authorized

exercises of DOJ authority. And, in any event, DOJ's suggestion is misleading. In the FY 2017 Byrne JAG award document, DOJ incorporated the broad definition of "program or activity" that is set forth in 42 U.S.C. § 2000d-4a. ER23. That provision defines "program or activity" as "*all* of the operations of" either the "department, agency, special purpose district, or other instrumentality of a State or of a local government" that receives federal assistance or "the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government." 42 U.S.C. § 2000d-4a(1) (emphasis added).

The entity that receives assistance from the Byrne JAG program is the City of Los Angeles, *see* ER32, and all of its operations include much more than just the operations of the CLEAR program. Thus, DOJ seeks to broadly impose its policy priorities on States and localities. Nothing in the Byrne JAG statute, however, permits DOJ to unilaterally impose the Conditions, and in fact its formula structure and several other features confirm that the Conditions are foreclosed.

### B. Section 10102(a)(6) Does Not Authorize The Notice And Access Conditions.

Without any authority for the Notice and Access Conditions in the Byrne JAG statutory framework, DOJ looks outside that statute. DOJ thus rests its claims of nearly unlimited authority on an illustrative clause in the last provision of a list of

powers, primarily coordination-related, exercised by the Assistant Attorney General. *See* 34 U.S.C. § 10102(a)(6). Every court to confront this argument has rejected it. As the Seventh Circuit held, "[t]he Attorney General's argument that such sweeping authority over the major source of funding for law enforcement agencies nationwide was provided to the Assistant Attorney General by merely adding a clause to a sentence in a list of otherwise-ministerial powers defies reason." *Chicago*, 888 F.3d at 287.

### 1. Section 10102(a)(6) does not expand the Assistant Attorney General's powers.

Section 10102 is titled "Duties and functions of Assistant Attorney General." Like many provisions throughout the U.S. Code, it is a descriptive provision outlining the powers of a government official. *See, e.g.*, 42 U.S.C. § 913 ("Duties" of Secretary of Health and Human Services). The first five provisions of subsection (a) describe various coordination duties of the Assistant Attorney General, from "coordinat[ing] and provid[ing] staff support to coordinate the activities" of other DOJ offices to "maintain[ing] liaison with public and private educational and research institutions, State and local governments, and governments of other nations relating to criminal justice." 34 U.S.C. § 10102(a)(1)-(5).

The last paragraph, Section 10102(a)(6), is a residual clause, stating that the Assistant Attorney General shall "exercise such other powers and functions as may be vested in the Assistant Attorney General pursuant to this chapter or by delegation

- 33 -

of the Attorney General, including placing special conditions on all grants, and determining priority purposes for formula grants." *Id.* § 10102(a)(6). On the basis of this innocuous "including" language, DOJ claims virtually unlimited authority to impose conditions on a significant number of federal grants.

The plain meaning of "including" demonstrates that section 10102(a)(6) confirms that the Assistant Attorney General's authority "includes" already existing authority to impose special conditions; it does not enlarge the powers of the Assistant Attorney General with blanket authority to impose such conditions. *See Az. State Bd. for Charter Sch. v. U.S. Dep't of Educ.*, 464 F.3d 1003, 1006 (9th Cir. 2006) ("[T]he language of a statute is controlling when the meaning is plain and unambiguous." (citation omitted)). "Including" is "ordinarily defined as a term of illustration, signifying that what follows is an example of the preceding principle." *Id.* at 1007-08 (citing *Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941)). As used in section 10102(a)(6), the word "including" connotes an illustrative application of the authority already vested in the Attorney General or Assistant Attorney General. *See id.*; *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1021 (9th Cir. 2016) (holding that "specifically including" means that "the claims in the second clause are a smaller subset of the . . . claims in the first clause"). Put another way, if placing special conditions or priority purposes on grants is either (a) vested in the Assistant Attorney General elsewhere in Chapter 101 or (b) delegated

to the Assistant Attorney General by the Attorney General exercising his authorities found elsewhere, then the Assistant Attorney General can exercise such powers. *See Chicago*, 888 F.3d at 285 (same). The "including" clause is not an unlimited independent delegation to place any conditions on federal grants. *See id.* (holding that "the Attorney General's position is untenable" because it "is so obviously belied by the plain meaning of the word 'including'").

DOJ's reading would require replacing the word "including" with the word "and," which runs afoul of the ordinary meaning of "including." *See P. C. Pfeiffer Co. v. Ford*, 444 U.S. 69, 77 n.7 (1979) (rejecting argument that "the word 'including' means 'and' or 'as well as'" and instead holding that " 'including' … indicate[s] that 'longshoring operations' are a part of the larger group of activities that make up 'maritime employment'"). For example, "[t]he phrase 'any American automobile, including any truck or minivan,' would not naturally be construed to encompass a foreign-manufactured minivan . . . ." Br. of United States, *Commonwealth of Massachusetts v. Environmental Protection Agency*, No. 05-1120, 2006 WL 3043970 at *34 (U.S. Oct. 24, 2006).

Interpreting section 10102(a)(6) as DOJ does would also contravene the Supreme Court's admonition that Congress does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Congress does not, in other words, "alter the fundamental details of a regulatory scheme in

vague terms or ancillary provisions." *Id.* Instead, courts "expect Congress to speak clearly" when "it wishes to assign to an agency decisions of vast economic and political significance." *Util. Air*, 134 S. Ct. at 2444 (internal quotation marks omitted).

The "including" clause in Section 10102(a)(6) is both a vague term and a residual clause in an ancillary provision, *see Whitman*, 531 U.S. at 468, and certainly not a clear expression of Congress's intent for the Assistant Attorney General for the Office of Justice Programs to impose the Notice and Access Conditions, much less *any* conditions he desires, on federal grants. Indeed, the first clause in section 10102(a)(6) does not delegate any independent authority, but rather describes the powers the Assistant Attorney General already has through delegation or other statutory provisions. It would be remarkable if such a seemingly innocuous provision could allow the Assistant Attorney General to subvert a carefully calibrated statutory grant like the Byrne JAG program, which includes a prescribed formula and limited, carefully defined circumstances for DOJ to withhold award funds. For the reasons set forth above, *supra* pp. 21-29, the Byrne JAG statute does not authorize these Conditions and "nothing in the Byrne JAG statute cross-references th[e] alleged authority [in section 10102(a)(6)] or even hints that the tightly-circumscribed structure of the Byrne JAG grants can be upended by some unbounded authority in § 10102 of the Assistant Attorney General to impose new

conditions"—which is even more striking given that the "including" clause and the Byrne JAG statute were part of the same Act. *Chicago*, 888 F.3d at 286. The "tremendous power of widespread impact" that DOJ seeks here "is not the type of authority that would be hidden in a clause without any explanation, and without any reference or acknowledgment of that authority in the statute that actually contains the grant itself." *Id.* at 287.

> **2.  DOJ's interpretation is fatally flawed because it would render superfluous a host of other statutory provisions.**

DOJ's interpretation of section 10102(a)(6) would make meaningless multiple provisions across the Byrne JAG statute and the U.S. Code. *See Chubb*, 710 F.3d at 966.

*First*, DOJ's interpretation would make superfluous the various provisions enacted by Congress within the Byrne JAG statute, such as the specification that the Attorney General may reserve up to five percent of funds for jurisdictions experiencing precipitous increases in crime, 34 U.S.C. § 10157(b), and may "reasonably require" the maintenance and recording of certain programmatic and financial information and records, *id.* § 10153(a)(4).

*Second*, DOJ would reduce to a nullity multiple statutory provisions outside the Byrne JAG statute in which Congress enacted affirmative authorizations for the Attorney General to condition Byrne JAG grants on adherence to federal policy preferences only in specified circumstances. In particular, 34 U.S.C. § 40914(b)(1)

(instant criminal background checks) and 34 U.S.C. § 60105(c) (death in custody reporting)—both enacted *after* section 10102(a)(6)—authorize the Attorney General to withhold a percentage of Byrne JAG funds for a jurisdiction's failure to comply with certain specific federal conditions. Those affirmative authorizations to withhold Byrne JAG funds in very limited circumstances would be entirely unnecessary under DOJ's interpretation of section 10102(a)(6). *See Gonzales v. Oregon*, 546 U.S. 243, 258 (2006) ("In light of these specific grants of . . . authority, we are unwilling to construe the ambiguous provisions . . . to serve this purpose [of creating further authority]—a purpose for which it obviously was not intended." (quoting *Fed. Maritime Comm'n v. Seatrain Lines, Inc.*, 411 U.S. 726, 744 (1973))).

In other statutes, Congress has required the Attorney General to condition some Byrne JAG funds on implementation of identified federal statutes, including the Sex Offender Registration and Notification Act, 34 U.S.C. § 20927(a), and the Victims of Trafficking and Violence Protection Act, *id.* § 12113, and it has not enacted any such provision regarding Byrne JAG funding and the INA. Moreover, even when it has directed the withholding of Byrne JAG funds in these limited situations, Congress has not authorized withholding of all such funding. *See supra* pp. 23-24. For example, Congress ensured that jurisdictions that do not implement the Sex Offender Registration and Notification Act would still retain *90 percent* of their Byrne JAG funds. 34 U.S.C. § 20927(a). But under the Department of Justice's

interpretation, it would have nearly unlimited authority to withhold *all* Byrne JAG funds from any jurisdiction that fails to comply with the Sex Offender Registration and Notification Act, or the Notice and Access Conditions, or any condition it manufactures.

*Third*, DOJ's interpretation would render superfluous provisions in other grant statutes. Because DOJ's interpretation applies, "at a minimum," DOJ Br. 17, to all grants under the auspices of the Assistant Attorney General, its interpretation of section 10102(a)(6) would make superfluous the statutory provisions enacted by Congress that identify the actual authority of the Assistant Attorney General's power to impose "terms and conditions" on discretionary grants under the Bureau of Justice Assistance.[12] *See* 34 U.S.C. § 10142(2). As the district court in *Chicago* stated recently, "it would be quite odd for Congress to give the Attorney General authority to impose conditions on the discretionary grants if it had already provided the Attorney General authority to impose conditions on all grants through Section 10102(a)(6)." *City of Chicago v. Sessions*, 264 F. Supp. 3d 933, 942 (N.D. Ill. 2017).

DOJ's attempt to fight superfluity with superfluity misses the mark. Its primary response is that section 10102(a)(6)'s "including" clause must be read as a

---

[12] As discussed above, section 10142(2) references the Director of Bureau of Justice Assistance. In the note to 34 U.S.C. § 10141, Congress transferred that function, among others, to the Assistant Attorney General for the Office of Justice Programs.

blank check of authority, or else *that* clause is superfluous. DOJ Br. 17-18. But DOJ misunderstands the import of "including" clauses. They are often, if not always, repetitive because they highlight a subset of a larger group already expressed in the statute. This well-settled function of an "including" clause does not make them meaningless. As "elucidative" statutory language, they "'perform a significant function simply by clarifying' a provision's meaning." *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 242 (2009) (quoting *United States v. Atl. Research Corp.*, 551 U.S. 128, 137 (2007)). Here, for example, the "including" clause makes clear that when the Assistant Attorney General imposes "terms and conditions" on discretionary Bureau of Justice Assistance grants under section 10142, they can include special conditions. *See* 34 U.S.C. § 10142(2); *see also infra* I.B.3 (explaining the specialized meaning of "special conditions" in the grant context). Or, if the Attorney General delegates his authority to impose "reasonable conditions" under the Violence Against Women Act grant to the Assistant Attorney General, then the Assistant Attorney General can impose "special conditions" pursuant to that delegation. *See* 34 U.S.C. § 10446(e)(3); *id.* § 10224 (Attorney General "may delegate to any of [his] respective officers or employees such functions under this chapter as [he] deem[s] appropriate.").

### 3. "Special Conditions" is a term of art in federal funding that is limited to high-risk grantees.

Even if DOJ were right that section 10102(a)(6)'s "including" clause is somehow an independent source of authority for the Assistant Attorney General, that still would not justify the Notice and Access Conditions because that section could authorize only "special conditions" to be imposed on grants. "Special conditions" has a specialized meaning in the federal grant context, which consists of conditions designed for high-risk grantees—and does not include a demand that States and localities change their law enforcement practices.

When Congress enacted section 10102(a)(6) in 2006, "special conditions" had a defined regulatory meaning. *See Williams v. King*, 875 F.3d 500, 503 (9th Cir. 2017) ("[W]e examine contemporaneous sources to determine the legal meaning of the term at the time Congress employed it in the statute."). Under 28 C.F.R. § 66.12, "special conditions" consisted of requirements imposed on high-risk grantees, such as "additional project monitoring" and "requiring additional, more detailed financial reports." 28 C.F.R. § 66.12(b)(3), (4) (2014). Therefore, "special conditions" is "a term of art for conditions intended for 'high-risk grantees; with difficulty adhering to existing grant requirements." *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 617 (E.D. Pa. 2017); *see also Chicago*, 888 F.3d at 285 n.2 (suggesting that the "Attorney General's argument might fail" for this additional reason, but declining to

address the issue because the "including" clause was not an independent source of authority).

Congress is assumed to legislate with the understanding of terms of art. *Williams*, 875 F.3d at 503 ("[I]t is a cardinal rule of statutory construction that, when Congress employs a term of art, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken." (quoting *F.A.A. v. Cooper*, 566 U.S. 284, 292 (2012))). That presumption is appropriate in the specialized grant context relevant here. It is confirmed by the fact that Congress has equated "special conditions" with high-risk grantees in at least one other statute enacted around the same time as section 10102(a)(6). *See* 20 U.S.C. § 1416(e) ("Identify the State as a high-risk grantee and impose special conditions on the State's grant under this subchapter.") (enacted Pub. L. No. 108-446, 118 Stat. 2647, 2734 (2004)).

The Department of Justice has not previously disagreed. When it removed 28 C.F.R. § 66.12 in 2014, it did not change its understanding of "special conditions." Instead, DOJ adopted a similar definition from the Office of Management and Budget ("OMB"). *See* 2 C.F.R. § 200.205(b) (OMB regulation) ("[I]f the Federal awarding agency determines that a Federal award will be made, *special conditions that correspond to the degree of risk assessed* may be applied to the Federal award." (emphasis added)); 2 C.F.R. § 2800.101 ("the Department of Justice adopts the

Office of Management and Budget (OMB) Guidance in 2 CFR part 200," with exceptions not relevant here).

Adherence to the accepted regulatory definition of "special conditions" is not only consistent with Congress's intent, but also avoids making the word "special" superfluous. For all its emphasis on avoiding alleged superfluity in section 10102(a)(6), DOJ has not suggested that "special" has any meaningful role to play in limiting DOJ's authority to attach conditions pursuant to section 10102(a)(6). In its view, the statute would have the same meaning if it had just said "conditions" instead of "special conditions." By using section 10102(a)(6) as an all-purpose delegation of power that authorizes any condition on federal grants, DOJ reads "special" out of the statute.

### 4. Requiring DOJ to comply with Congress's intent will not nullify other Byrne JAG conditions.

Without a statutory basis for the Conditions, DOJ resorts to hyperbole, asserting that many run-of-the-mill grant conditions will be unlawful unless it has unlimited authority under section 10102(a)(6). DOJ Br. 13. DOJ's argument that its other conditions can be authorized *only* under its broad construction of section 10102(a)(6) is misplaced.

Notably, prior to creating the Notice and Access Conditions in 2017, DOJ appears never to have invoked section 10102(a)(6) as a basis for its more traditional grant conditions. When listing the statutory authority for the FY 2016 award, which

contained many of the same conditions as the 2017 award with the notable exception of the Notice and Access Conditions, the award document did not cite section 10102(a)(6) for its statutory authority, instead listing only the Byrne JAG statutory provisions. *See* ER32 ¶ 13 (identifying "STATUTORY AUTHORITY FOR GRANT" as "42 USC 3750, et seq." (now 34 U.S.C. § 10151 et seq.)). It was only in the 2017 awards that DOJ first asserted section 10102 as statutory authority. *See* ER8 (identifying "STATUTORY AUTHORITY FOR GRANT" as "Title I of Pub L No 90-351 (generally codified at 42 U S C 3711 - 3797ff-5) [now 34 U.S.C. §§ 10101 - 10706], including subpart 1 of part E (codified at 42 U S C 3750 - 3758) [now 34 U.S.C. §§ 10151-10158]; see also 28 U S C 530C(a)"). There is thus no evidence that DOJ has relied on section 10102(a)(6) as authority for its non-immigration Byrne JAG conditions. This Court should thus "greet . . . with a measure of skepticism" DOJ's belated discovery of powers under section 10102(a)(6). *Util. Air Grp.*, 134 S. Ct. at 2442.

The likely reason that DOJ did not invoke section 10102(a)(6) for the conditions in FY 2016 awards is that those conditions appear to be authorized by other statutory or regulatory provisions. *See* 34 U.S.C. § 10153(a)(5)(D) (requiring Byrne JAG applicants to comply with "applicable Federal laws"). For example, a jurisdiction that buys body armor with Byrne JAG funds has to comply with body armor conditions (*see* DOJ Br. 13) because Congress has required that. 34 U.S.C.

§ 10202(c) (requiring grantees that use funds to purchase body armor to comply with specific requirements); *id.* § 10531(f)(1). Other conditions similarly require compliance with already existing law. *See* ER17 ¶ 31 (citing 28 C.F.R. Part 46 regarding human research)[13]; *id.* ¶ 30 (requiring compliance with 28 C.F.R. Part 23 if "applicable"); *id.* ¶ 27 ("Program income (as defined in the Part 200 Uniform Requirements) must be used in accordance with the provisions of the Part 200 Uniform Requirements."). Other conditions cited by DOJ are authorized by the Byrne JAG statute itself. *See* ER21 ¶ 45 (prohibited expenditures); 34 U.S.C. § 10152(d) ("Prohibited uses"); ER17 ¶¶ 28-29 (information sharing); 34 U.S.C. § 10153(a)(4) (jurisdictions can be "reasonably require[d]" to "maintain and report" certain "data, records, and information (programmatic and financial)"); ER18 ¶¶ 34-35 (training); 34 U.S.C. § 10153(b) ("Technical assistance"). There is thus no risk that the City's position would have the sweeping implications DOJ claims. And even if a few of these conditions were not justified by statute, "an agency may not 'bootstrap' its position by mere reiteration of its claim of authority." *S. Ry. Co. v. I. C. C.*, 553 F.2d 1345, 1349 (D.C. Cir. 1977) (quoting *FMC v. Seatrain Lines, Inc.*, 411 U.S. 726, 746 (1973)).

---

[13] The regulations and the Office of Justice Program's website make clear that the research condition applies only to "OJP-funded research projects that involve human subjects." *See* https://ojp.gov/funding/Explore/SolicitationRequirements/Evidence ResearchEvaluationRequirements.htm; *see also* 28 C.F.R. § 46.103(a).

### C. Federalism Principles Require A Clear Statement Before DOJ Can Impose The Notice And Access Conditions.

Even if section 10102(a)(6) were arguably a basis for imposing some conditions on Byrne JAG grants, it is not the clear statement necessary to allow DOJ to impose conditions, like the Notice and Access Conditions, that infringe on core powers of state and local sovereignty. *See Va. Dep't of Educ. v. Riley*, 106 F.3d 559, 566 (4th Cir. 1997) (en banc) (adopting the dissenting panel op. of Luttig, J.), *superseded by statute*.

The en banc Fourth Circuit's decision in *Riley* is instructive. Relying on the Supreme Court's decision in *Gregory v. Ashcroft*, 501 U.S. 452 (1991), *Riley* held that courts do not allow federal agencies to impose their own grant conditions on States and local governments, but require "unambiguous statutory expression of congressional intent to condition the States' receipt of federal funds in a particular manner." 106 F.3d at 566. In *Riley*, the Department of Education interpreted a statutory ambiguity as authorizing it to withhold education funding absent compliance with the Department's own condition. The government agreed that the relevant statutory provision was ambiguous and therefore did not clearly authorize the agency's condition, but argued that the condition was a reasonable interpretation of the ambiguity. *Id.* at 567. The en banc Fourth Circuit rejected that position, and held that "statutory ambiguity defeats altogether a claim by the Federal Government

- 46 -

that Congress has unambiguously conditioned the States' receipt of federal monies in the manner asserted." *Id.*

*Riley*'s holding forecloses DOJ's reliance on section 10102(a)(6) or any other provision of the Byrne JAG statute. DOJ has never suggested that there is a clear statement from Congress authorizing the Notice and Access Conditions or anything like it. The necessity for clarity is "especially important" here because "the claimed condition requires the surrender of one of . . . the powers or functions reserved to the States by the Tenth Amendment." *Id.* at 566 (discussing conditions on education); *see also id.* at 563 ("An adjustment to the critical balance of power between the Federal Government and the States cannot be authorized implicitly.").

As the Seventh Circuit recognized, the Notice and Access Conditions require Los Angeles to change its allocation of local law enforcement resources—a power at the core of State and municipal sovereignty. *See Chicago*, 888 F.3d at 282 ("The choice as to how to devote law enforcement resources—including whether or not to use such resources to aid in federal immigration efforts—would traditionally be one left to state and local authorities."). Conditions that obligate Los Angeles to shift its limited local law enforcement resources away from LAPD's priorities in order to accommodate an unknown number of requests and potentially futile interviews by DHS officials to attempt to enforce federal immigration law necessitate Congress's

clear approval. Absent that clarity, an Executive Branch agency may not unilaterally impose the Notice and Access Conditions.

Congress understood that DOJ might abuse its limited powers over grants. It thus prohibited federal agencies from "exercis[ing] *any* direction, supervision, or control over any police force or any other criminal justice agency of any State or any political subdivision thereof." 34 U.S.C. § 10228 (emphasis added).[14] Adding to the list of statutes that DOJ is casting aside, the agency is attempting to do exactly what section 10228 prevents: wielding its powers over grant funds to exercise "control over . . . 'vital matters pertaining to the day-to-day operations of local law enforcement.'" *Ely v. Velde*, 451 F.2d 1130, 1136 (4th Cir. 1971) (quoting S. Rep. No. 90-1097 at 222 (1968)) (discussing 42 U.S.C. § 3766(a), an earlier version of section 10228(a)).[15] For instance, the Access Condition would require LAPD to

---

[14] The Tenth Amendment "withhold[s] from Congress the power to issue orders directly to the States." *Murphy v. NCAA*, 138 S. Ct. 1461, 1475 (2018). Section 10228 demonstrates that Congress was aware of the risk that DOJ would use grants to circumvent the Tenth Amendment, and so emphasized that DOJ could not use its grant powers to effectively issue orders to States and localities to change their law enforcement practices.

[15] Members of Congress stressed that they were not only worried about literal mandates on State and local governments, but the use of "federal assistance to state and local law enforcement" as a "vehicle for the imposition of federal guidelines" on such agencies. S. Rep. No. 90-1097, 1968 U.S.C.C.A.N. 2112, 2276 (1968) (views of Senators Dirksen, Hruska, Scott, and Thurmond). DOJ, supporting an earlier version, agreed that it would violate both "the mandate and spirit" of the provision to withhold funds because police departments were not run "the way the

divert its limited law-enforcement resources away from managing and safeguarding its jails and instead put those resources toward setting up, safeguarding, and overseeing interviews between DHS and inmates who DHS "believes" to be noncitizens, even where the inmate has already made clear they have no intention of talking with DHS. Likewise, the Notice Condition requires local law enforcement agencies to divert their resources from their management of their own detention facilities, and related safety and security, to have their local personnel respond to requests from DHS about release dates of particular noncitizens in order for federal immigration authorities to pursue investigations for civil immigration enforcement purposes. Section 10228 confirms that Byrne JAG funds are not to be used for such purposes, but instead should be disbursed according to Congress's carefully tailored statutory framework.

### D. The INA Does Not Authorize DOJ's New Notice and Access Conditions.

DOJ devotes a substantial portion of its brief to arguing that the Notice and Access Conditions are only "modest requirements" that ensure that the policies of States and localities "do[] not pose an obstacle" or "impair" federal civil immigration

---

Attorney General says they must" be run. *Controlling Crime Through More Effective Law Enforcement: Hearings Before the Subcomm. on Criminal Laws and Procedure of the S. Comm. on the Judiciary*, 90th Cong. at 100, 384, 497 (1967).

enforcement. But there is no exception that allows a federal agency to impose *ultra vires* conditions because the agency considers its burdens to be "modest."

DOJ repeats the contentions that it made before the Seventh Circuit that "[n]othing in the statute supports the counterintuitive conclusion that applicants can insist on their entitlement to federal law-enforcement grants even as they refuse to provide the most basic cooperation in immigration enforcement." DOJ Br. 16; *Chicago*, 888 F.3d at 283 ("[T]hroughout the briefs in this case, the Attorney General is incredulous that localities receiving federal funds can complain about conditions attached to the distribution of those funds."). But that framing flips the inquiry on its head—and reflects "a disturbing disregard for the separation of powers." *Chicago*, 888 F.3d at 283. The question is not whether anything *prohibits* the agency's action (though as explained above, the statutory framework here *does* prohibit it), but whether Congress has *authorized* such action. Regardless of whether an Executive Branch agency considers the conditions to be "modest" or "basic," it "does not . . . have the inherent authority as to the grant at issue here to condition the payment of such federal funds on adherence to its political priorities." *Id.*

Furthermore, DOJ is wrong when it says that the Conditions prevent States and localities from "impair[ing]" or "pos[ing] an obstacle" to federal immigration enforcement. DOJ Br. 14. As the Seventh Circuit aptly held, "nothing in this case involves any affirmative *interference* with federal law enforcement at all, nor is there

any interference whatsoever with federal immigration authorities." *Chicago*, 888 F.3d at 282. Los Angeles's decision to, for example, conserve its local law enforcement resources by not providing access for DHS officials to interview detainees who decline to be interviewed, is a judgment regarding the proper prioritization of those local law enforcement resources that local communities traditionally make. *See id.* ("The choice as to how to devote law enforcement resources—including whether or not to use such resources to aid in federal immigration efforts—would traditionally be one left to state and local authorities.").

DOJ also speculates that the "structure" of the INA "contemplates" that the federal government will take custody of certain noncitizens "upon their release." DOJ Br. 14. The plain language of the INA, however, does not require that States or localities play a role in the *federal government*'s detention of noncitizens. Instead, the INA provides only that States may voluntarily participate in immigration enforcement in limited ways. *See, e.g.*, 8 U.S.C. § 1252c; *id.* § 1357(g); 8 C.F.R. § 287.7(a) ("detainer is a request"); *Arizona v. United States*, 567 U.S. 387, 408 (2012) ("Federal law specifies limited circumstances in which state officers may perform the functions of an immigration officer."). And DOJ itself has recently acknowledged, before the Supreme Court, that "it is . . . particularly unlikely that Congress made the success of its mandatory-detention regime dependent upon

obtaining perfect cooperation from States and localities." Br. of United States at *27, *Nielsen v. Preap*, No. 16-1363, 2018 WL 2554770 (U.S. June 1, 2018).

When Congress has imposed duties on States and localities in immigration enforcement, it has done so expressly. *See* 8 U.S.C. § 1373. Even then, such efforts are constitutionally problematic. In section 1373, Congress prohibited States and localities from restricting their law enforcement officers from providing citizenship and immigration information to federal immigration officials. But courts have held that, under the Tenth Amendment, section 1373 violates the Constitution. *Philadelphia*, 309 F. Supp. 3d at 325-31; *Chicago*, 321 F. Supp. 3d at 866-73; *San Francisco*, 2018 WL 4859528 at *13-17; *New York*, 2018 WL 6257693 at *10-14.[16]

When Congress wanted to provide funding for States and localities assisting in civil immigration enforcement, it knew how to do so. In 8 U.S.C. § 1231(i), Congress enacted a grant program allowing States and localities to request funding from the Attorney General "with respect to the incarceration of an undocumented criminal alien." *Id.* § 1231(i)(1)(A). Nowhere in the INA did Congress authorize funding for States and localities that comply with the Notice and Access Conditions—or threaten the *withholding* of federal funding for those that do not.

---

[16] The constitutionality of section 1373 is not before the Court in this appeal.

## II. DOJ'S IMPOSITION OF THE NOTICE AND ACCESS CONDITIONS VIOLATES THE SPENDING CLAUSE.

This Court may affirm the district court's entry of the preliminary injunction on any ground supported by the record, even if not the basis for the decision below. *Enyart v. Nat'l Conference of Bar Exam'rs, Inc.*, 630 F.3d 1153, 1159 (9th Cir. 2011).[17] Accordingly, the preliminary injunction may also be affirmed because DOJ's imposition of the Notice and Access Conditions violates the Constitution's Spending Clause, U.S. Const. art. I, § 8, cl. 1.

Congress may impose certain conditions on grants to States and cities. *South Dakota v. Dole*, 483 U.S. 203, 207-09 (1987). But Congress must comply with several important restrictions on the exercises of this power, including the requirement that "conditions on receipt of federal funds must be reasonably related to the articulated goal." *Nevada v. Skinner*, 884 F.2d 445, 447 (9th Cir. 1989); *see also New York v. United States*, 505 U.S. 144, 167 (1992) (conditions must "bear some relationship to the purpose of the federal spending").

---

[17] The district court did not resolve the City's Spending Clause or Administrative Procedure Act arguments in granting the motion for preliminary injunction, but in denying DOJ's motion to dismiss, the district court held that the City "properly stated a claim that the Notice and Access Conditions violate the Spending Clause" and "plausibly stated a claim that the Notice and Access Conditions are arbitrary and capricious." D. Ct. Dkt. No. 94, at 6-7.

The Notice and Access Conditions are not reasonably related to Congress's articulated goal for the Byrne JAG program: to provide States and localities with flexibility to address their local criminal justice needs, specifically through funds for "additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice." 34 U.S.C. § 10152(a)(1); *see also* H.R. Rep. No. 109-233 at 89. Congress specified the purposes of this criminal justice grant by listing eight specific types of state and local programs that can be funded, from drug treatment programs to crime-victim programs. 34 U.S.C. § 10152(a)(1). And Congress structured the Byrne JAG program as a formula grant, so that the amount of funds States generally receive are tied to their violent crime rates. *See id*. § 10156. As the statute reflects, the manifest purpose of the Byrne JAG program is to give States and localities "more flexibility to spend money for programs that work for them rather than to impose a 'one size fits all' solution," H.R. Rep. No. 109-233, at 8, and thereby to "enhanc[e] local criminal justice." *Philadelphia*, 280 F. Supp. 3d at 642.

In seeking to compel States and localities to facilitate federal civil immigration enforcement, DOJ has undercut the Byrne JAG program's purposes and imposed conditions not reasonably related to the program's goal. *See id.* at 643 ("Any relationship connecting this formula grant program, which provides wide latitude to states and municipalities, and the [C]onditions . . . is . . . difficult to

discern."). Further highlighting the absence of any reasonable relationship here, the conditions DOJ seeks to impose pertain only to civil immigration law, not criminal law. *See Melendres v. Arpaio,* 695 F.3d 990, 1001-02 (9th Cir. 2012) ("Unlawful presence is not criminal," and "detain[ing] individuals solely because of their immigration status" is "a purely civil matter"). In sum, DOJ's "argument that enforcement of federal immigration laws is related to th[e] objective [of enhancing local criminal justice under the Byrne JAG grant] is unsustainable." *Philadelphia*, 280 F. Supp. 3d at 642.

## III. DOJ'S IMPOSITION OF THE NOTICE AND ACCESS CONDITIONS VIOLATES THE ADMINISTRATIVE PROCEDURE ACT.

This Court may also affirm the entry of the preliminary injunction because DOJ's imposition of the Notice and Access Conditions is invalid under the Administrative Procedure Act ("APA").

The APA directs courts to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Defendants' imposition of the Notice and Access Conditions on Byrne JAG grants violates the APA because it is not in accordance with law as set forth above, *supra* I, II, and also cannot survive arbitrary-and-capricious review.

DOJ's imposition of the Notice and Access Conditions violates the APA's fundamental requirement of "reasoned decisionmaking." *Sever v. NLRB*, 231 F.3d 1156, 1164 (9th Cir. 2000). As demonstrated by the lack of an administrative record, DOJ has not "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (citation omitted).

The agency provided no support for the purported link between the Notice and Access Conditions and Congress's enactment of the Byrne JAG program to provide funding for specified state and local criminal justice programs. DOJ asserted in a press release that "[s]o-called 'sanctuary' policies make all of us less safe because they intentionally undermine our laws and protect illegal aliens who have committed crimes," and, therefore, the Conditions are "part of accomplishing the Department of Justice's top priority of reducing violent crime." *See* ER63. But DOJ has cited no evidence to support the implied premise that undocumented immigrants commit violent crimes at higher rates than the general population, or to indicate that the investigations of federal civil immigration violations facilitated by the Conditions are focused on individuals involved in violent crime. The real impact of DOJ's new policy is the opposite of its expressed intent, in that it *deprives* States and cities of resources to "reduc[e] violent crime."

DOJ arbitrarily ignored or misconstrued evidence undermining its conclusions. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (decision is arbitrary and capricious where agency "offered an explanation for its decision that runs counter to the evidence before the agency"). In particular, studies have shown that there is no relationship, or an inverse relationship, between "sanctuary" policies and crime. *See* SER22-28; *Chicago*, 321 F. Supp. at 877 ("[N]ot only are there no peer-reviewed studies supporting the AG's proposed correlation, the scholarship on the subject actually suggests that such policies do not affect, and might even lower, crime rates."). DOJ's wholesale failure to adequately consider this substantial body of evidence renders its decision arbitrary and capricious. *See Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018) (agency "cannot ignore evidence that undercuts its judgment; and it may not minimize such evidence without adequate explanation").

## CONCLUSION

For the reasons set forth above, the district court's order should be affirmed.

DATED:     December 3, 2018                Respectfully submitted,


                                           *s/* Michael N. Feuer
                                           Michael N. Feuer
                                               *City Attorney*

Mitchell A. Kamin                          James P. Clark
Mónica Ramírez Almadani                        *Chief Deputy City Attorney*
Neema T. Sahni                             Leela A. Kapur
COVINGTON & BURLING LLP                         *Executive Assistant City*
1999 Avenue of the Stars                       *Attorney*
Los Angeles, California 90067              Valerie L. Flores
(424) 332-4800                                 *Managing Senior Assistant*
                                               *City Attorney*
David M. Zionts                            Michael Dundas
Ivano M. Ventresca                             *Deputy City Attorney*
Benjamin L. Cavataro                       200 North Main Street, City Hall
COVINGTON & BURLING LLP                    East Suite 800
One CityCenter                             Los Angeles, California 90012
850 Tenth Street NW                        (213) 978-8344
Washington, DC 20001
(202) 662-6000
                                           *Attorneys for Plaintiff-Appellee*
                                           *City of Los Angeles*

**STATEMENT OF RELATED CASES**

Pursuant to Ninth Circuit Rule 28-2.6, Plaintiff-Appellee states that it is not aware of any related cases not mentioned in Defendants-Appellants' opening brief.


   *s/* Michael N. Feuer
Michael N. Feuer
*City Attorney*

*Attorney for Plaintiff-Appellee*
*City of Los Angeles*

December 3, 2018

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Circuit Rule 32-1(a) because it contains 13,374 words, excluding the parts of the brief exempted by Rule 32(f).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman and 14 point font.

<u>   s/ </u>Michael N. Feuer
Michael N. Feuer
*City Attorney*

*Attorney for Plaintiff-Appellee*
*City of Los Angeles*

December 3, 2018

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on December 3, 2018.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*s/* Michael N. Feuer
Michael N. Feuer
*City Attorney*

*Attorney for Plaintiff-Appellee*
*City of Los Angeles*

December 3, 2018

# STATUTORY ADDENDUM

# STATUTORY ADDENDUM TABLE OF CONTENTS

34 U.S.C. § 10141 ................................................................. A-1

34 U.S.C. § 10142 ................................................................. A-2

34 U.S.C. § 10157 ................................................................. A-3

34 U.S.C. § 10228 ................................................................. A-4

34 U.S.C. § 10446 ................................................................. A-5

34 U.S.C. § 12113 ................................................................. A-6

34 U.S.C. § 20927 ................................................................. A-8

34 U.S.C. § 30307 ................................................................. A-9

34 U.S.C. § 40914 ............................................................... A-11

34 U.S.C. § 60105 ............................................................... A-12

42 U.S.C. § 3573 (2000), *repealed* (2006) ........................................ A-13

**34 U.S.C. § 10141**

§ 10141. Establishment of Bureau of Justice Assistance

(a) There is established within the Department of Justice, under the general authority of the Attorney General, a Bureau of Justice Assistance (hereafter in this subchapter referred to as the "Bureau").

(b) The Bureau shall be headed by a Director (hereafter in this subchapter referred to as the "Director") who shall be appointed by the President. The Director shall report to the Attorney General through the Assistant Attorney General. The Director shall have final authority for all grants, cooperative agreements, and contracts awarded by the Bureau. The Director shall not engage in any employment other than that of serving as the Director, nor shall the Director hold any office in, or act in any capacity for, any organization, agency, or institution with which the Bureau makes any contract or other arrangement under this chapter.

. . . .

TRANSFER OF FUNCTIONS

Pub. L. 106-113, div. B, §1000(a)(1) [title I, §108(b)], Nov. 29, 1999, 113 Stat. 1535, 1501A-20, provided that: "Notwithstanding any other provision of law, effective August 1, 2000, all functions of the Director of the Bureau of Justice Assistance, other than those enumerated in the Omnibus Crime Control and Safe Streets Act, as amended, 42 U.S.C. 3742(3) through (6) [now 34 U.S.C. 10142(3)-(6)], are transferred to the Assistant Attorney General for the Office of Justice Programs."

**34 U.S.C. § 10142**

§ 10142. Duties and functions of Director

The Director shall have the following duties:

. . .

(2) Establishing programs in accordance with part B of subchapter V and, following public announcement of such programs, awarding and allocating funds and technical assistance in accordance with the criteria of part B of subchapter V, and on terms and conditions determined by the Director to be consistent with part B of subchapter V.

. . . .

TRANSFER OF FUNCTIONS

Effective Aug. 1, 2000, all functions of Director of Bureau of Justice Assistance, other than those enumerated in pars. (3) to (6) of this section, transferred to Assistant Attorney General for Office of Justice Programs, see section 1000(a)(1) [title I, § 108(b)] of Pub. L. 106-113, set out as a note under section 10141 of this title.

**34 U.S.C. § 10157**

§ 10157. Reserved funds

(a) Of the total amount made available to carry out this part for a fiscal year, the Attorney General shall reserve not more than--

    (1) $20,000,000, for use by the National Institute of Justice in assisting units of local government to identify, select, develop, modernize, and purchase new technologies for use by law enforcement, of which $1,000,000 shall be for use by the Bureau of Justice Statistics to collect data necessary for carrying out this part; and

    (2) $20,000,000, to be granted by the Attorney General to States and units of local government to develop and implement antiterrorism training programs.

(b) Of the total amount made available to carry out this part for a fiscal year, the Attorney General may reserve not more than 5 percent, to be granted to 1 or more States or units of local government, for 1 or more of the purposes specified in section 10152 of this title, pursuant to his determination that the same is necessary--

    (1) to combat, address, or otherwise respond to precipitous or extraordinary increases in crime, or in a type or types of crime; or

    (2) to prevent, compensate for, or mitigate significant programmatic harm resulting from operation of the formula established under section 10156 of this title.

**34 U.S.C. § 10228**

§ 10228. Prohibition of Federal control over State and local criminal justice agencies; prohibition of discrimination

(a) General rule

Nothing in this chapter or any other Act shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over any police force or any other criminal justice agency of any State or any political subdivision thereof.

. . . .

**34 U.S.C. § 10446**

§ 10446. State grants

. . .

(e) Disbursement

. . .

> (3) Conditions
>
> In disbursing grants under this subchapter, the Attorney General may impose reasonable conditions on grant awards to ensure that the States meet statutory, regulatory, and other program requirements.

. . . .

**34 U.S.C. § 12113**

§ 12113. Aimee's Law

. . .

(c) Penalty

(1) Single State

Pursuant to regulations promulgated by the Attorney General hereunder, in any case in which a criminal-records-reporting State convicts an individual of murder, rape, or a dangerous sexual offense, who has a prior conviction for any one of those offenses in a State described in paragraph (3), it may, under subsection (d), apply to the Attorney General for $10,000, for its related apprehension and prosecution costs, and $22,500 per year (up to a maximum of 5 years), for its related incarceration costs with both amounts for costs adjusted annually for the rate of inflation.

(2) Multiple States

Pursuant to regulations promulgated by the Attorney General hereunder, in any case in which a criminal-records-reporting State convicts an individual of murder, rape, or a dangerous sexual offense, who has a prior conviction for any one or more of those offenses in more than one other State described in paragraph (3), it may, under subsection (d), apply to the Attorney General for $10,000, for its related apprehension and prosecution costs, and $22,500 per year (up to a maximum of 5 years), for its related incarceration costs with both amounts for costs adjusted annually for the rate of inflation.

(3) State described

Pursuant to regulations promulgated by the Attorney General hereunder, a State is described in this paragraph unless--

(A) the term of imprisonment imposed by the State on the individual described in paragraph (1) or (2), as applicable, was not less than the average term of imprisonment imposed for that offense in all States; or

A-6

(B) with respect to the individual described in paragraph (1) or (2), as applicable, the individual had served not less than 85 percent of the term of imprisonment to which that individual was sentenced for the prior offense.

For purposes of subparagraph (B), in a State that has indeterminate sentencing, the term of imprisonment to which that individual was sentenced for the prior offense shall be based on the lower of the range of sentences.

(d) State applications

In order to receive an amount under subsection (c), the chief executive of a State shall submit to the Attorney General an application, in such form and containing such information as the Attorney General may reasonably require, which shall include a certification that the State has convicted an individual of murder, rape, or a dangerous sexual offense, who has a prior conviction for one of those offenses in another State.

(e) Source of funds

(1) In general

Pursuant to regulations promulgated by the Attorney General hereunder, any amount under subsection (c) shall be derived by reducing the amount of Federal law enforcement assistance funds received by the State pursuant to section 10156 of this title that convicted such individual of the prior offense before the distribution of the funds to the State. No amount described under this section shall be subject to section 3335(b) or 6503(d) of Title 31[.]

(2) Payment schedule

The Attorney General, in consultation with the chief executive of the State that convicted such individual of the prior offense, shall establish a payment schedule.

. . . .

A-7

**34 U.S.C. § 20927**

§ 20927. Failure of jurisdiction to comply

(a) In general

For any fiscal year after the end of the period for implementation, a jurisdiction that fails, as determined by the Attorney General, to substantially implement this subchapter shall not receive 10 percent of the funds that would otherwise be allocated for that fiscal year to the jurisdiction under subpart 1 of part E of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3750 et seq.).

. . . .

**34 U.S.C. § 30307**

§ 30307. Adoption and effect of national standards

. . .

(e) Eligibility for Federal funds

    (1) Covered programs

        (A) In general

        For purposes of this subsection, a grant program is covered by this subsection if, and only if--

            (i) the program is carried out by or under the authority of the Attorney General;
            (ii) the program may provide amounts to States for prison purposes; and
            (iii) the program is not administered by the Office on Violence Against Women of the Department of Justice.

        (B) List

        For each fiscal year, the Attorney General shall prepare a list identifying each program that meets the criteria of subparagraph (A) and provide that list to each State.

    (2) Adoption of national standards

        (A) In general

        For each fiscal year, any amount that a State would otherwise receive for prison purposes for that fiscal year under a grant program covered by this subsection shall be reduced by 5 percent, unless the chief executive officer of the State submits to the Attorney General proof of compliance with this chapter through--

            (i) a certification that the State has adopted, and is in full compliance with, the national standards described in subsection (a); or

(ii) an assurance that the State intends to adopt and achieve full compliance with those national standards so as to ensure that a certification under clause (i) may be submitted in future years, which includes--

> (I) a commitment that not less than 5 percent of such amount shall be used for this purpose; or
> (II) a request that the Attorney General hold 5 percent of such amount in abeyance pursuant to the requirements of subparagraph (E).

. . . .

**34 U.S.C. § 40914**

§ 40914. Penalties for noncompliance

. . .

(b) Penalties

    (1) Discretionary reduction

        (A) During the 2-year period beginning 3 years after January 8, 2008, the Attorney General may withhold not more than 3 percent of the amount that would otherwise be allocated to a State under section 10156 of this title if the State provides less than 50 percent of the records required to be provided under sections 40912 and 40913 of this title.

        (B) During the 5-year period after the expiration of the period referred to in subparagraph (A), the Attorney General may withhold not more than 4 percent of the amount that would otherwise be allocated to a State under section 10156 of this title if the State provides less than 70 percent of the records required to be provided under sections 40912 and 40913 of this title.

    (2) Mandatory reduction

    After the expiration of the periods referred to in paragraph (1), the Attorney General shall withhold 5 percent of the amount that would otherwise be allocated to a State under section 10156 of this title, if the State provides less than 90 percent of the records required to be provided under sections 40912 and 40913 of this title.

    (3) Waiver by Attorney General

    The Attorney General may waive the applicability of paragraph (2) to a State if the State provides substantial evidence, as determined by the Attorney General, that the State is making a reasonable effort to comply with the requirements of sections 40912 and 40913 of this title, including an inability to comply due to court order or other legal restriction.

. . . .

**34 U.S.C. § 60105**

§ 60105. State information regarding individuals who die in the custody of law enforcement

. . .

(c) Compliance and ineligibility

(1) Compliance date

Each State shall have not more than 120 days from December 18, 2014, to comply with subsection (a), except that--

(A) the Attorney General may grant an additional 120 days to a State that is making good faith efforts to comply with such subsection; and

(B) the Attorney General shall waive the requirements of subsection (a) if compliance with such subsection by a State would be unconstitutional under the constitution of such State.

(2) Ineligibility for funds

For any fiscal year after the expiration of the period specified in paragraph (1), a State that fails to comply with subsection (a), shall, at the discretion of the Attorney General, be subject to not more than a 10-percent reduction of the funds that would otherwise be allocated for that fiscal year to the State under subpart 1 of part E of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3750 et seq.), whether characterized as the Edward Byrne Memorial State and Local Law Enforcement Assistance Programs, the Local Government Law Enforcement Block Grants Program, the Edward Byrne Memorial Justice Assistance Grant Program, or otherwise.

. . . .

**42 U.S.C. § 3573 (2000),** *repealed* **(2006)**

§ 3753. State applications

(a) To request a grant under this part, the chief executive officer of a State shall submit an application within 60 days after the Bureau has promulgated regulations under this section, and for each subsequent year, within 60 days after the date that appropriations for this subchapter are enacted, in such form as the Director may require. Such application shall include the following:

. . .

    (11) An assurance that the State has established a plan under which the State will provide without fee to the Immigration and Naturalization Service, within 30 days of the date of their conviction, notice of conviction of aliens who have been convicted of violating the criminal laws of the State and under which the State will provide the Service with the certified record of such a conviction within 30 days of the date of a request by the Service for such record.

. . . .